```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT  OF TEXAS
 2                    AMARILLO DIVISION

 3   TRACY PRICE,                    §
                                     §
 4        Plaintiff,                 §
                                     §
 5   VS.                             §
                                     §
 6   TAKATA CORP., a Japanese        §
     Corporation; TAKATA, INC., a    §
 7   Delaware Corporation; TK HOLDINGS, §
     INC., a Delaware Corporation; TK §
 8   HOLDINGS I, LLC, a Delaware     §
     Corporation; TAKATA RESTRAINT   §
 9   SYSTEMS, INC., a Delaware       §
     Corporation; TAKATA SEAT BELTS, §   CASE NO. 2:08-CV-151-J
10   INC., a Delaware Corporation;   §
     TAKATA USA, CORP., a Delaware   §
11   Corporation; HONDA MOTOR        §
     COMPANY, LTD., a Japanese       §
12   Corporation; HONDA RESEARCH AND §
     DEVELOPMENT CO., LTD., a        §
13   Japanese Corporation; AMERICAN  §
     HONDA MOTOR COMPANY, a Delaware §
14   Corporation; HONDA OF AMERICA   §
     MANUFACTURING, INC., a Delaware §
15   Corporation; UNITED STATES      §
     TESTING COMPANY, INC.,a Delaware §
16   Corporation,                    §
                                     §
17        Defendants.                §

18   ==========================================================
19
                REQUESTED EXCERPT OF TRIAL TESTIMONY OF
20
21              HIDEO KITAMURA (BY DEPOSITION)
22
                        APRIL 6, 2009
23
24                      VOLUME I OF I
25   ==========================================================
```

On the 6th day of April, 2009, during a Civil Trial by
Jury in the above-entitled and numbered cause before the
Honorable Mary Lou Robinson, United States District Judge for
the Northern District of Texas, presiding and a jury, the
following requested excerpt was had:


Proceedings reported by mechanical stenography; transcript
produced by computer.



                        A-P-P-E-A-R-A-N-C-E-S


FOR THE PLAINTIFF:              MR. JAMES P. LYLE
                                Law Office of James P. Lyle
                                Attorneys at Law
                                1116 Second Street, NW
                                Albuquerque, NM  87102


                                        AND


                                MR. RICHARD F. ROWLEY, II and
                                MR. RICK ROWLEY, III
                                Rowley Law Firm, LLC
                                Attorneys at Law
                                305 Pile
                                Clovis, NM  88102-0790


                                        AND


                                MR. JOHNNY KENT MERRITT
                                Irwin, Merritt, Hogue & Price
                                Attorneys at Law
                                320 S Polk St, Suite 500
                                Amarillo, TX  79101

```
 1   FOR THE TAKATA DEFENDANTS:    MR. DAVID R. KELLY
                                   Bowman & Brooke, LLP
 2                                 Attorneys at Law
                                   150 South 5th St., Suite 3000
 3                                 Minneapolis, MN  55402

 4

 5

 6

 7   FOR THE HONDA DEFENDANTS:     MR. JEFFREY S. HAWKINS and
                                   MR. GRANT T. MCFARLAND
 8                                 Prichard, Hawkins, McFarland
                                      & Young, LLP
 9                                 Attorneys at Law
                                   10101 Reunion Place
10                                 Suite 600
                                   San Antonio, TX  78216
11

12                                              AND

13

14
                                   MR. THOMAS C. RINEY
15                                 Riney & Mayfield, LLP
                                   Attorneys at Law
16                                 320 S Polk St., Suite 600
                                   Amarillo, TX  79101
17

18

19

20
     COURT REPORTER:               MS. STACY MAYES MORRISON
21                                 Official Court Reporter
                                   205 E. 5th, LB #F13263
22                                 Amarillo, Texas  79110
                                   (806) 372-1175
23

24

25
```

1          PROCEEDINGS FOR APRIL 6, 2009

2          (The following requested excerpt took place in open

3    court with the jury and all parties present.)

4                    MR. LYLE:   May I proceed, Your Honor?

5                    THE COURT:   Yes, sir.

6                    MR. LYLE:   This is from the deposition of Hideo

7    Kitamura taken on March the 11th of 2002.   Page 6, Line 19.

8                    MR. KELLY:   Your Honor, we've designated 12 through

9    15 on that page.

10                   THE COURT:   Would you give me the -- I'm sorry,

11   tell me the number again, please.

12                   MR. LYLE:   Page 6, Line 19.

13                   THE COURT:   Page 6?

14                   MR. LYLE:   Line 19.

15                   THE COURT:   Let me be sure we're on the same one.

16   Does that begin, "Is that all of the formal education," or

17   "That's right"?

18                   Where on page -- I want to be sure I'm on the same

19   document.

20                   MR. KELLY:   His question begins at --

21                   THE COURT:   This deposition I have in my hand is

22   March 11; is that correct?

23                   MR. LYLE:   No, you should have the deposition

24   from -- yeah, March 11th, 2002.

25                   THE COURT:   All right.   Now, on Page 6, line what?

1          MR. LYLE:  Line 19.

2          THE COURT:  "As I understand it," does it start

3    there?

4          MR. LYLE:  Yes, that's correct, Your Honor.

5          THE COURT:  All right.  Go ahead.

6          MR. KELLY:  And we had designated some lines above

7    that, beginning with 12 to read it in context, Your Honor.

8          MR. LYLE:  Your Honor, I haven't received the

9    Defendants' cross-designations, so I have no way of doing it,

10   but I invite Counsel to do that when they get back up there.

11         THE COURT:  Well, you can do that when he finishes.

12         MR. LYLE:  Okay.

13         MR. KELLY:  We did provide those, Counsel.

14         <u>PLAINTIFF'S READING OF HIDEO KITAMURA DEPOSITION</u>

15      (Whereupon, portions of the oral deposition of Hideo

16   Kitamura are read as follows, with questions being read by

17   Mr. Lyle and answers being read by Mr. Rick Rowley:

18   Q.    "As I understand it, your entire employment with Takata

19   Corporation has been with the design division; is that

20   correct?

21   A.    "If I were to give you an accurate answer to that

22   question, I would say I have been involved in engineering-

23   related work, including design.

24   Q.    "Have you worked with one particular division or more

25   than one division of Takata Corporation during your

1    employment?

2    A.    "An accurate answer for that, in terms of what

3    departments I have been working, would be Design and

4    Development Department, and Testing and Evaluation

5    Department.

6    Q.    "What is --"

7         MR. LYLE:  I'm sorry.  Line 17.

8    Q.    "What is your formal education in the English language?

9    A.    "I joined during my junior high school, senior high

10   school and university years, I took English classes.

11   Q.    "Do you perform any of your communications at work in

12   English?

13   A.    "No, I don't.

14   Q.    "For example, do you ever read correspondence, e-mails,

15   things that come in English before they are translated?

16   A.    "English text e-mails and so forth would go through

17   professional translator or specialized translator to have

18   those texts translated into Japanese, and then I read them.

19   Q.    "Do you ever read these texts before they are

20   translated?

21   A.    "Sometimes I do read English text.  However, I'm not

22   sure whether I understood correctly or not.  That's why I

23   have the translator translate the text for me, so I can read

24   in Japanese.

25   Q.    "Do you ever respond by drafting an English-language

1    response?

2    A.    "No, I never write such thing in English."

3             MR. KELLY:   Your Honor, we object to the next line.

4             MR. LYLE:   I'm not going to read that, Counsel.   I

5    took -- I told --

6             MR. KELLY:   Did you take that out?

7             MR. LYLE:   Yes.

8             MR. KELLY:   Well, I must not have read that.

9             MR. LYLE:   Yeah.   If I -- if I start to read a

10   question and you think it's problematic, please let me know,

11   but wait until I read the question, please.

12            MR. KELLY:   Well, I can't do that.

13            THE COURT:   Now where?

14            MR. LYLE:   Pursuant to our bench conference, I'm

15   taking out some material, Your Honor.

16        (Pause.)

17            MR. LYLE:   Okay.   Page 12, Line 9.

18            MR. KELLY:   Your Honor, we object to this as the

19   matter previously excluded, and it refers to the 1,000 and

20   3,000 insertions, which is relating to the matter the Court

21   previously excluded.

22            THE COURT:   Overruled.

23   Q.    "The testing -- I'm sorry.   Start over.

24        "Physically, what did your testing show happens between

25   1,000 and 3,000 insertions that doesn't happen before and

1    doesn't happen after?"

2        MR. KELLY:  Your Honor, this is expressly relating

3    to the matter the Court has excluded.  It's highly

4    prejudicial.

5        THE COURT:  The Court's already ruled.

6        MR. LYLE:  And then I say:  "That's not a good

7    question.  I'm going to rephrase the question."

8    Q.   "Physically, what changes to the parts of the buckle

9    between 1,000 and 3,000 insertions, so that the problem

10   doesn't exist before 1,000, and the problem doesn't exist

11   after 3,000, according to your testing."

12       MR. LYLE:  And then I say:  "I have some documents

13   and diagrams that were provided to us under Tab 4, if these

14   will assist you."

15       MR. KELLY:  What line are we on now, Counsel?

16       MR. LYLE:  We're on Page 13 -- well --

17       THE COURT:  He left out --

18       MR. LYLE:  "Assist you in --"

19       THE COURT:  -- some particular language --

20       MR. LYLE:  "-- your explanation."

21       THE COURT:  -- in -- and you're now on Page 13.

22       MR. LYLE:  Yes, Page 13.  And the answer at Line 6?

23   A.   "Is it all right to take a look at it?

24   Q.   "Yes, please do.  I think most of these diagrams are

25   under Tab 4.

A.   "I'm sorry, it has lapsed some time.   Could I have the last question given one more time?"

        MR. LYLE:   Okay.   The question was reread by the interpreter.

A.   "One of the component in the buckle had its dimension significantly off from the drawing.   When that component is combined with other components, and if that causes the significant overlapping, then there is a possibility of partial engagement in the buckle during 1,000 to 3,000 insertions."

        MR. KELLY:   Your Honor, we object.   There is no allegation of a manufacturing defect like that in this case for this buckle.

        THE COURT:   Overruled.

Q.   "Why does that problem only exist between 1,000 and 3,000 insertions?

A.   "There is a component called latch in the -- the component called latch, there is a small piece in there called the lock plate, and if the distance between the latch and the lock plate is an issue.

        "In early stage, when the coating is sufficient, it can operate smoothly.   And, later on, when coating started to wear out, then metal pieces start rubbing each other, and there is a possibility of non-smooth or poor movement of the lock plate between 1,000 and 3,000 insertions.   However,

1    after 3,000 insertions, metal wear progresses so that it

2    causes a clearance so that it would solve the problem in that

3    condition."

4              MR. LYLE:  Page 19, Line 17.

5              MR. KELLY:  Same objection, Your Honor.

6              THE COURT:  Overruled.

7              MR. LYLE:  Are you there?

8              MR. RICK ROWLEY:  Yes, sir.

9    Q.   "The necessary amount of wear to achieve the result that

10   you described earlier, when you were explaining why, after

11   3,000 latches -- or 3,000 insertions before the problem with

12   false latching doesn't happen anymore?

13   A.   "I do not -- as to the amount of wear, I don't remember

14   it.

15   Q.   "I understand that, but do you have a range of wear that

16   is required?  For example, that it is more or less than a

17   tenth of a millimeter required?

18   A.   "Since I don't quite understand what you mean by the

19   'range of wear,' so let me state the way that I understand

20   it.  When the amount of overlap of those component's

21   dimension is .04, or less than .03, then the problem would

22   not occur.  That's the way I understand it."

23             MR. LYLE:  Page 22, Line 9.  I'm sorry, Page 21

24   Line 9.  Excuse me.

25             MR. KELLY:  Same objection, Your Honor.

1        THE COURT:  Overruled.

2   Q.    "Were the -- was the latch and the lock plate designed

3   to wear significantly during their lifetime?

4   A.    "No, it is not designed to cause such wear.  And as I

5   said before, there was components which were significantly --

6   significantly off from the drawing in its dimension, and for

7   those, the wear would be a problem.

8   Q.    "What do you mean by a 'problem'?

9   A.    "For those items, wears could occur.

10  Q.    "But they were not designed to wear, or were they

11  designed to wear?

12  A.    "In terms of design, it is not meant to have a wear."

13        MR. LYLE:  Your Honor, based upon our ruling at the

14  bench conference, I'm going to exclude the next section that

15  was designated beginning at Page 30, Line 13.

16        THE COURT:  Well, tell me where you're going to

17  pick up.

18        MR. LYLE:  Yes, Your Honor.  Page 43, Line 21, and

19  I'm going to modify the beginning of the question slightly,

20  Your Honor.

21  Q.    "The question is:  Did you previously testify,

22  'Question:  Who are the other inventors of the TK-52?

23        "'Answer:  I believe, other than myself, there was an

24  individual by the name of Kimura.'

25        "Was that your answer to the question?

1   A.   "Yes, I believe I stated the way it is shown on the page

2   that you showed me.

3   Q.   "At the time you gave that answer, was it true and

4   correct, under penalty of perjury, to the best of your

5   knowledge?

6   A.   "Yes, I did."

7             MR. LYLE:   I'm going to Page 55, Line 14.

8             MR. KELLY:   Are you going to exclude that

9   reference?

10            MR. LYLE:   Yeah, I'm going to exclude everything

11  preceding that.

12            MR. KELLY:   Well, one moment, Your Honor.

13      (Attorney/Attorney sotto-voce conference.)

14            MR. LYLE:   Are you there?

15            MR. RICK ROWLEY:   Yes, sir.

16  Q.   "Did Takata, during this --"

17            MR. KELLY:   Same objection, Your Honor, for the

18  record.

19            THE COURT:   Overruled.

20            MR. KELLY:   Thank you.

21  Q.   "Did Takata, during this investigation, determine that

22  the buckles which suffer from this combination of things,

23  could be false latched as a result of actual use?

24  A.   "I'm sorry, the question was rather lengthy, so I would

25  like to have the Japanese question one more time."

1        MR. LYLE:   The question was reread by the

2   interpreter.

3   A.   "As a result of various investigations, we confirmed

4   that, depending on how those combinations were created, there

5   is a possibility of partial engagement in the field.

6   Q.   "And by 'in the field,' did you mean the possibility of

7   partial engagement as result of actual use?

8   A.   "I mean, there is a possibility of this occurrence when

9   this -- these were used -- these were actually used."

10       MR. LYLE:   Page 57, Line 9.

11       MR. KELLY:   Your Honor, if the Court will look at

12  56, Line 25, the Court will see that this expressly deals

13  with an excluded matter.   That's Page 56, Line 25.

14       MR. LYLE:   That's why I've taken that initial

15  reference out, and I'm --

16       THE COURT:   Well, just a moment, Counsel.   I need

17  to read this.

18       MR. LYLE:   I'm sorry, ma'am.

19       MR. KELLY:   It clearly applies to the whole

20  testimony there, Your Honor.

21      (Pause.)

22       THE COURT:   And you want to pick up where?

23       MR. LYLE:   At Line 9, Your Honor.

24       THE COURT:   Sustained to that.

25       MR. LYLE:   Page 67, Line 9.

1    THE COURT:   67?

2    MR. LYLE:   Yes, Your Honor.

3    Q.   "I'm not asking you about whether it is installed in a

4    vehicle, and I'm not asking you about whether there would be

5    any problem.  I'm asking you, if based on Takata's

6    investigation, Takata's position is that it is possible, or

7    not possible, to false latch a belt with this number, if the

8    tongue is inserted into the buckle slowly at an angle?"

9    MR. KELLY:   Your Honor, the number refers to the

10   matter excluded by the Court.

11   THE COURT:   Overruled.

12   A.   "I believe one needs to describe under what conditions

13   we are talking about.  What I'm answering here is that if

14   that -- if that is used -- if that is to be used in actual

15   use, representing actual use, then this should not have any

16   problem."

17   MR. LYLE:   And then Page 70, Line 17.

18   Q.   "Regardless of what you and I think 'actual use' means,

19   holding the buckle in one hand and the tongue in the other,

20   should I be able to false latch that buckle if I insert the

21   tongue slowly at an angle?

22   A.   "When one is inserting slowly, if one is trying to have

23   that latched, then I don't believe there would be any

24   problem.  However, if one were trying to cause some problem,

25   or in a mean-spirited way, then maybe one could cause some

1    problem.

2    Q.    "By 'problem,' do you mean false latching?

3    A.    "If one were trying to cause a false latch, then there

4    may be a possibility of causing that.

5    Q.    "Thank you.

6    A.    "So my belief is that maybe one could possibly cause

7    that."

8                MR. LYLE:    Page 72, Line 8.

9    Q.    "And there is no written procedure, as far as you know,

10   that defines exactly how the 209 S3G testing is supposed to

11   be performed; is that correct?

12   A.    "Right.    Nothing other than the ones stated in the 209,

13   and basic information is written in the 209.

14   Q.    "The definition of, quote, 'representative of actual

15   use,' closed quote, is not defined, is it?

16   A.    "Right, I believe it is not stated.

17   Q.    "And would you agree with me that actual use encompasses

18   many, many different ways that many, many different people

19   have of using your seat belts?

20   A.    "Yes.

21   Q.    "As a seat belt designer, do you consider it foreseeable

22   that occasionally people will buckle their belts using only

23   one hand?

24   A.    "Yes, we can think of such use by users.

25   Q.    "Do you consider it foreseeable that people who use your

1   seat belts may have some physical condition that makes it

2   difficult for them to get the tongue into the buckle on the

3   first try?

4   A.    "Although, I'm not sure what circumstances you are

5   describing, but I can consider such situation occurring.   And

6   I understood that to mean that this individual, when one is

7   trying to use a seat belt, such a situation may occur.   Am I

8   correct?

9   Q.    "Yes.   From the standpoint of you as one of the

10  designers of this belt?

11  A.    "Yes.

12  Q.    "Likewise, from that same point of view, do you consider

13  that some people will insert the tongue slowly, and others

14  will insert it more rapidly?

15  A.    "Yes.

16  Q.    "Do you consider it foreseeable that foreign material

17  such as Coca Cola may occasionally get poured inside the

18  buckles?

19  A.    "Yes, such a situation can be thought of.

20  Q.    "And sometimes that will happen in a part of the world

21  such as Hobbs, New Mexico, where the summers -- where in the

22  summers it can get very, very hot inside the vehicles,

23  correct?

24  A.    "Yes, I can think of vehicles in -- inside of vehicles

25  getting hot.

1   Q.   "And Takata's testing of TK-521 buckles has shown that,

2   when Coke was poured into it and it was baked in an oven,

3   that that enabled false latching to occur, correct?

4   A.   "I want to hear in Japanese one more time."

5        MR. LYLE:   The question was reread by the

6   interpreter.

7   A.   "To answer precisely to your question, when we poured

8   the Coke into the buckle and bake it in the oven, and when

9   we -- and when one repeated many, many times this process,

10  then ultimately we found out that we could create a situation

11  similar to a false latch.

12  Q.   "And what is it, if you know, about the design of the

13  521 buckle that permits this to occur?

14  A.   "Since the Coke, which was poured into the 521 was

15  sticky condition, I could say that sticky Coke caused that

16  condition.

17  Q.   "But what is it about the way the structure of the belt

18  is designed that permits a sticky condition to cause false

19  latching?

20  A.   "When the Coke is stuck into the inside of the base,

21  then that becomes sticky condition, so that could cause that

22  situation.   And that could happen by having a sticky

23  condition on the latch as well.

24  Q.   "Is that the same aspect of the design that permits

25  false latching if the belt --"

1     MR. LYLE:  I'm sorry.

2  Q.    "-- of the belt if one latches it in a mean-spirited

3  way?

4  A.    "I'm not sure exactly what you mean by 'mean-spirited

5  way.'  What is done in a mean-spirited way in your question?

6  Q.    "I'm using that in the same way as you used that word

7  right before the break when you had to go to the bathroom,

8  when you were answering my question.

9  A.    "If that is the definition, then what I stated would be

10 included, as well as the circumstances where the latch is not

11 fully locked.

12 Q.    "And what is it about the design of this buckle that

13 allows that to happen?  I'm talking about the internal

14 structure of the buckle.

15 A.    "Since the question was rather hard for me to

16 understand, I would like to hear it one more time, or could

17 you restate in a more easy to understand way?

18 Q.    "Would you like to hear it repeated, or would you like

19 me to restate it?

20 A.    "I would like to hear that one more time."

21     MR. LYLE:  The question was reread by the

22 interpreter.

23 A.    "One could -- one could be the lock plate allowing that

24 to happen.  And I'm referring to the kind of maneuver which I

25 talked about before the break, doing it in a mean-spirited

1    way, with the intention of causing that phenomenon."

2         MR. LYLE:   Page 79, Line 2.

3    Q.   "I would be happy for you to explain how the design of

4    the buckle permits this to occur.

5    A.   "It is not in terms of a design aspect which is allowing

6    this to happen, but, rather, when the latch is not coming

7    down completely, then that is the situation where partial

8    engagement is occurring.  In other words, it is accurate to

9    say the latch and the lock plate are not in the locking

10   position.

11   Q.   "Why doesn't the design of this buckle cause the ejector

12   spring to always eject the tongue if that has occurred?

13   A.   "As I mentioned earlier, if one is trying to cause PE,

14   and causing PE as a result, then the ejector would not be

15   able to do that."

16        MR. LYLE:   Page 82, Line 12.

17   Q.   "So did you find --"

18        MR. KELLY:   Excuse me just a minute.

19        MR. LYLE:   Oh, I'm sorry.

20   Q.   "So did you find that belts that false latched did

21   activate the buckle switch when they were false latched?

22   A.   "We know that would happen to the buckle which had false

23   latching.

24   Q.   "Do you know that also happens to the buckles that are

25   false latched when somebody tries to do so in a mean-spirited

1   way?

2   A.   "We know that would also occur when one tried to do it

3   with a willful way.

4   Q.   "How long has Takata known that?

5   A.   "Since you did not define what 'that' is, could you

6   define it, what we knew?

7   Q.   "The buckles that false latched, when one attempts to do

8   so in a mean-spirited way --"

9        MR. LYLE:   I'm sorry.   I'm sorry, I need to -- I

10  messed that up.   Page 83, Line 1.

11  Q.   "That buckles that false latched when one attempts to do

12  so in a mean-spirited way, would trigger the buckle switch?

13  A.   "We knew that could happen if one has a will to cause

14  that, and we knew that from the development stage.

15  Q.   "When did the development stage take place?

16  A.   "Around 1983."

17       MR. LYLE:   Page 97, Line 22.

18  Q.   "Has Takata ever investigated whether partial release

19  can be achieved in these buckles if the button on the buckle

20  is partially depressed during insertion of the tongue?

21  A.   "Do you mean one is trying to cause a partial

22  engagement?

23  Q.   "Whether one is trying to do so, or whether one does so

24  accidentally, has that ever been investigated?

25  A.   "If I were to answer accurately, rather than answering

1  whether or not we have done such investigation, it would be

2  we have made such tries.

3  Q.    "And what did you find?

4  A.    "What we found out is by depressing the button, and if

5  one tried to cause a partial engagement in a mean-spirited

6  way, then there are some occasions when partial engagement

7  does occur.

8  Q.    "How long has Takata known that?

9  A.    "We were aware of that, namely, that could occur if one

10 were to try to do it in a mean-spirited way, even from the

11 development time.

12 Q.    "When was that?

13 A.    "Around 1983.

14 Q.    "And at any time since then, has Takata ever issued any

15 warnings to be passed onto users of these buckles that says,

16 don't perform the insertion in what you mean by a mean-

17 spirited way?

18 A.    "We didn't do that, because it's not necessary to do so.

19 Q.    "Who determined that it wasn't necessary to do so?

20 A.    "Members who were involved in development at the time.

21 Q.    "Were you one of them?

22 A.    "That's right."

23     (Attorney/Attorney sotto-voce conference.)

24        MR. KELLY:  Your Honor, the next lines, we object

25 to other matters, that the Court has excluded other matters

```
1    that --
2              THE COURT:  Are you talking about 12?
3              MR. KELLY:  Beginning with Line 12.
4              THE COURT:  Sustained.
5              MR. LYLE:  Okay.  Your Honor, but I would like to
6    then read beginning at Line 22 on that page.
7              MR. KELLY:  One moment, please.
8              THE COURT:  I believe we'd better exclude that too,
9    Counsel.
10             MR. LYLE:  And I would like to read Page 100,
11   Line 15 to 21, and the answer going through 21.
12             MR. KELLY:  I believe the Court's ruled that that
13   should be excluded.
14             THE COURT:  Sustained.
15             MR. LYLE:  I think -- oh, wait.  Let's see.
16   Page 105, Line 18.
17             MR. KELLY:  Through what?
18             MR. LYLE:  Through 106, 15.
19             MR. KELLY:  Nothing was designated after 106,
20   Line 4 in your designations.  We object on that basis, Your
21   Honor.
22             THE COURT:  Well, we're on 105.
23             MR. KELLY:  Right, but he was going to read through
24   107 or something.
25             THE COURT:  Well, we'll -- stop at the portion
```

1   you've designated, and I'll look at it.

2           MR. KELLY:  Right.  We have designated, only for

3   clarity, Your Honor, excuse me, 105, Line 18 through 106,

4   Line 4.

5           MR. LYLE:  That is correct, Your Honor.  That is

6   correct.

7           THE COURT:  You may do that.

8           MR. LYLE:  Thank you.

9   Q.    "Has Takata ever received anything from the United

10  States Government that says partial engagement testing is not

11  required for belts equipped with an ejector spring?

12  A.    "No, there wasn't such a thing."

13          MR. LYLE:  Okay.  So we're not going to read --

14  yeah, we'll just stop there.

15          Those are all the Plaintiff's designated portions,

16  Your Honor.

17          THE COURT:  Did you -- Counsel, you suggested you

18  had some other portions you wanted read for completeness?

19          MR. KELLY:  Yes, Your Honor.  May we have a moment?

20          THE COURT:  Yes.

21          MR. KELLY:  I need to find them.

22      (Pause.)

23          MR. KELLY:  Let's begin with -- if you would, will

24  you continue to read for us?

25          MR. RICK ROWLEY:  Sure, absolutely.

1     MR. KELLY:   Thank you very much.   Page 3, Lines 8

2     through 9.

3          THE COURT:   Page 3?

4          MR. KELLY:   Excuse me.   Page -- yes, Page 3.   Well,

5     it's where he states his name at the beginning of the

6     deposition.   Would you please read Page 3, 8 and 9.

7          MR. RICK ROWLEY:   Do you want to ask the question

8     on Line 8?

9     <u>DEFENDANTS' READING OF HIDEO KITAMURA DEPOSITION</u>

10         (Whereupon, portions of the oral deposition of Hideo

11    Kitamura are read as follows, with questions being read by

12    Mr. Kelly and answers being read by Mr. Rick Rowley:

13    Q.   "Please state your name.

14    A.   "Hideo Kitamura."

15         MR. KELLY:   Then we have Page 6, Lines 12 through

16    15.

17    Q.   "What is your educational background?

18    A.   "Upon graduating from high school, I entered in Osaka

19    Industrial University.   And I graduated from there in 1974,

20    obtaining an engineering degree there."

21         MR. KELLY:   One moment, Your Honor.   I think the

22    next is on Page 23.

23         (Pause.)

24         MR. KELLY:   Oh, yes, Page 23, Line 19 through

25    Page 24, Line 8.

1    Q.    "Was the problem with --"

2          MR. LYLE:  Excuse me, Your Honor.  This is the

3    matter that the Court excluded, and I wasn't allowed to ask

4    these questions.

5          THE COURT:  You were what?

6          MR. LYLE:  This is the matter that the Court

7    excluded, and I wasn't allowed to ask any questions on this

8    subject.

9          MR. KELLY:  Many questions on this subject were

10   asked, Your Honor.  Beginning 23, Line 19.

11         THE COURT:  You may -- you may read that.

12   Q.    "Was the problem with this part in the die limited,

13   according to Takata's investigation, to a single part in a

14   single die?

15   A.    "That's right.

16   Q.    "When was that part installed in the die?

17   A.    "The result of the investigation revealed it was October

18   through November of '93.

19   Q.    "Is that it was installed sometime during that period,

20   or is that period of time what Takata believes is the amount

21   of time that that part was used in the die?

22   A.    "The period of time I just mentioned was a time frame

23   when the part was in use."

24         MR. KELLY:  Okay.  One moment, Your Honor.

25         (Pause.)

1          MR. KELLY:  Next is on Page 71, Page 71, Line 15

2    through 22.

3    Q.    "When Takata's employees tested the TK-52 buckles to see

4    if they complied with Federal Motor Vehicle Safety Standard

5    209 S3G --"

6          MR. KELLY:  I think that should be S5G.

7    Q.    "-- they would hold the buckle and the tongue on the

8    table and insert the tongue in various ways at various angles

9    and at various speeds; is that correct?

10   A.    "Yes, we do -- we try to do various ways, considering

11   how it would be actually used."

12         MR. KELLY:  Okay.  Page 77, Lines 13 through 17.

13   Q.    "Well, what do you exactly mean by mean-spirited way?

14   A.    "I'm talking about the try in which one has a

15   determination, regardless of by what means, one is going to

16   cause PE."

17         MR. KELLY:  Next we have Page 80, Line 2 through

18   17.

19   Q.    "Takata is always cognizant of other buckles being

20   introduced into the marketplace, isn't it?"

21         MR. LYLE:  Counsel --

22         THE COURT:  I'm sorry.  You're beginning where?

23         MR. KELLY:  Page 80, Line 1.

24         MR. LYLE:  Line 1.  Thank you.

25         THE COURT:  Oh, all right.  Go ahead.

1  MR. KELLY:  Oh, did I state something else?

2  MR. LYLE:  You said Line 2.

3  MR. KELLY:  Oh, I'm sorry.  Line 1 through 17.

4  Q.  "Takata is always cognizant of other buckles being

5  introduced into the marketplace, isn't it?

6  A.  "I believe in your question you are referring to the

7  products introduced by seat belt manufacturers other than

8  Takata.  If so, we are paying attention to those products.

9  Q.  "And in doing so, have you become aware of any other

10  seat belt used by other -- another manufacturer that permits

11  partial engagement like this when one intentionally tries to

12  do so?

13  A.  "Yes, I am aware that if one intentionally tried to

14  cause that, that would happen with others.

15  Q.  "Which ones?

16  A.  "I believe an accurate answer is with any seat belts."

17  MR. KELLY:  Your Honor, we would reserve the right

18  to read more upon review of the portions that were read that

19  had been designated and that we thought were within the

20  subject --

21  THE COURT:  You may do that later on.

22  MR. KELLY:  Thank you, Your Honor.

23  MR. LYLE:  Your Honor, in response to one section

24  that was read, I would like to read from Page 26, Line 15.

25  THE COURT:  All right.  Just -- just a moment.

1          MR. KELLY:  Your Honor, we object.  This refers to

2     the --

3          THE COURT:  Sustained.

4          MR. LYLE:  Okay.  Nothing else.

5          THE COURT:  Ladies and gentlemen of the jury,

6     you're -- in just a moment, you'll be in recess until 1:30.

7          Now, two things in addition to what you've been

8     told.  You, of course, should not discuss the case with each

9     other.  Don't discuss the case with anyone else.  Hold

10    yourself completely apart from the people involved in this

11    litigation; the parties, the witnesses, and the attorneys and

12    anyone associated with them.

13         Now, you've heard some discussion about what might

14    have been found on the Internet.  Do not go to the Internet

15    and make any independent investigation of your own.  The

16    rules of evidence are very specific, and they provide for

17    cross-examination.  Independent investigation on the part of

18    jurors could result in our having to try this case over

19    again.  So do not go to the Internet and make any independent

20    investigation.

21         Now, we will be recessing for the day tomorrow at

22    12:00.  So if you have some plans that you need to take care

23    of, you can plan on doing them tomorrow afternoon.  Then

24    we'll reconvene and begin Wednesday morning.

25         You're in recess at this time until 1:30.

```
1        COURT SECURITY OFFICER:  All rise.

2        (End of requested excerpt.)

3

4

5                      *   *   *   *   *   *

6        I certify that the foregoing is a correct transcript

7   from the record of proceedings in the above-entitled matter.

8   I further certify that the transcript fees format comply with

9   those prescribed by the Court and the Judicial Conference of

10  the United States.

11

12  s/Stacy Mayes Morrison              4/6/09
    Stacy Mayes Morrison                Date
13  Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```